UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RON STROLBERG, et al.,<br>Plaintiffs,<br>v.<br>AKAL SECURITY CO.; UNITED STATES MARSHAL'S SERVICE; UNITED STATES DEPARTMENT OF JUSTICE and the UNITED STATES OF AMERICA,<br>Defendants. | CASE NO. 03-0004-S-DOC<br><br>O R D E R GRANTING SUMMARY JUDGMENT |

Before the Court are several motions, opposing, and replying papers filed over the past six months. The complicated chronology of those filings and the disposition of the various issues raised therein is explained below.[1] The Court issued a tentative order and heard oral argument from the parties on January 10, 2005.

---

[1] The management of this case has been complicated by the large and changing number of plaintiffs. The difficulties have been compounded with multiple requests for extension of time, duplicate filings, and incorporation of past arguments and filings into subsequent papers. This order represents an attempt to resolve all pending motions.

## I. BACKGROUND

This case began its life in January 2003 as a class action on behalf of as many as 4,500 Court Security Officers ("CSOs") nationwide. The original defendants were the security companies who directly employed the Plaintiffs and the government agencies ("Federal Defendants") responsible for the implementation of medical standards that Plaintiffs claim were applied as a pretext for age discrimination. The case was not certified as a class action, and much of the first amended complaint was dismissed.[2] On October 24, 2003, in the second amended complaint, claims against all security companies except Akal Security Inc. were dropped.[3] The case is set for jury trial on February 14, 2005.

On July 23, 2004, the Federal Defendants filed a motion for Summary Judgment as to Sixty-Eight Plaintiffs and Partial Summary Judgment as to Six Additional Plaintiffs ("Third Motion for Summary Judgment") (Docket No. 135). The response from Plaintiffs' was received on September 3, 2004 (Docket No. 155), and the reply from the Federal Defendants was received on October 8, 2004 (Docket No. 164).

On July 28, 2004, five days after the Federal Defendants filed the Third Motion for Summary Judgment, Plaintiffs filed a motion for Leave to Make Technical Amendment to Second Amended Complaint to Add a Due Process Cause of Action ("Motion to Amend") (Docket No. 140). On September 3, 2004, Defendant Akal responded to the motion (Docket No. 152), and on September 7, 2004 the Federal Defendants responded (Docket No. 156). On October 20, 2004 Plaintiffs' filed their reply (Docket No. 170).

On September 21, 2004, three plaintiffs moved for partial dismissal of their claims, and

---

[2]*See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss; and Granting Leave to Amend (August 12, 2003) (Docket No. 93). The Court granted leave to amend the complaint to state claims under the Rehabilitation Act and the ADEA.

[3]The case against another security company, MVM, Inc., was re-filed in the United States District Court for the Eastern District of Pennsylvania. In July 2004, that Court dismissed substantially identical claims against the same Federal Defendants. *See Leitch v. MVM Inc.*, No. Civ.A.03-4344, 2004 WL 1638132 (E.D. Pa. July 22, 2004).

three others moved for total dismissal (Docket No. 160). On October 29, 2004, the fifty "Non-Terminated" CSOs moved for dismissal without prejudice (Docket No. 172). Both of these motions were granted by the Court on November 1, 2004.

On December 1, 2004, the Federal Defendants filed a motion for summary judgment with respect to the remaining plaintiffs on the Rehabilitation Act and ADEA causes of action ("Fourth Motion for Summary Judgment") (Docket No. 185). Plaintiffs responded on December 15, 2004 (Docket No. 204).[4] On that same day, all charges against Defendant Akal were dismissed with prejudice by stipulation (Docket No. 203). The Federal Defendants filed their reply on December 20, 2004 (Docket No. 206).

On December 1, 2004, Plaintiffs also filed a motion purporting to be a motion for summary judgment (Docket No. 184).[5] On December 10, 2004 Federal Defendants filed a response (Docket No. 200), and on December 20, 2004 Plaintiffs replied (Docket No. 206).

This flurry of motion practice has left only the Federal Defendants in the case, and has reduced the total number of plaintiffs to twenty-five.[6] The causes of action still in play as of July

---

[4]In their response to Defendants' motion for summary judgment, Plaintiffs failed to file a statement of facts which are in dispute, and thus failed to comply with Local Rule 7.1(c)(2). The Court will infer disputes of fact from Plaintiffs papers when they conflict with those facts presented by Defendants. However, any undisputed facts alleged by Defendants will be assumed consented to by Plaintiffs. Plaintiffs asserted at oral argument that it is the local custom in Idaho not to file such statements. Defendants did not dispute this characterization.

[5]Plaintiffs again failed to comply with Local Rules, in this instance, Local Rule 7.1(b)(1) which required them to file a separate statement of all material facts which the moving party contends are not in dispute. Furthermore, although styled as a motion for summary judgment, the papers consist largely of arguments that should have been included in the opposition to the Federal Defendants' Fourth Motion for Summary Judgment. Although the motion could be deemed improper for these reasons, the Court will consider the arguments presented in the moving papers in resolving Federal Defendants' motions for summary judgment.

[6]Plaintiff Harry Mason moved to dismiss his claims with prejudice in Plaintiffs' response to the Fourth Motion for Summary Judgment. That motion is GRANTED, with each party to bear their respective costs

23, 2004 were those under the Rehabilitation Act and ADEA. However, in the response to the Fourth Motion for Summary Judgment, Plaintiffs moved to dismiss the ADEA cause of action. The Court thus orders that the ADEA cause of action against Federal Defendants be DISMISSED WITH PREJUDICE. After hearing oral arguments, the Court requested additional briefing from the parties on the question of futility of the proposed amendment to add a due process claim. In considering the remaining motions, the Court will first examine the Motion to Amend, and then analyze the Third and Fourth Motions for Summary Judgment in tandem.

## II. DISCUSSION

### A. Amending to Add Procedural Due Process Claim

#### *1. Legal Standard*

Generally, leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend lies within the sound discretion of the trial court, which "must be guided by the underlying purpose of Rule 15—to facilitate decisions on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). Thus, Rule 15's policy of favoring amendments to pleadings should be applied with "'extreme liberality.'" *Id.* (citation omitted); *accord DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). However, "late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986).

The United States Supreme Court has identified four factors relevant to whether a motion for leave to amend should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). The Ninth Circuit holds that these factors are not of equal weight, specifically, "delay alone—no matter how lengthy—is an insufficient ground for denial of leave to amend." *Webb*, 655 F.2d at 980; *accord DCD Programs*, 833 F.2d at 186. The most important factor is whether amendment would prejudice the opposing party. *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973). Futility of amendment can, by itself, justify denial of a motion for

leave to amend. *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995); *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). Whether an amended pleading is futile is determined by the same standards that govern a motion to dismiss under Rule 12(b)(6). *See Miller*, 845 F.2d at 214 (citing 3 J. Moore, *Moore's Federal Practice* ¶ 15.08[4] (2d ed. 1974)).

*2. Analysis*

Plaintiffs motion proffers no clear argument in support of amending the second amended complaint. Rather, they characterize the amendment as "technical," and conclude that a cause of action for violation of due process was contained in scattered paragraphs of the complaint. In their reply brief, Plaintiffs make several arguments. First, they assert that the claim for due process violation was always in the complaint, and that Defendants were on notice of such a claim. To buttress this claim, Plaintiffs argue that due process was discussed in the depositions of witnesses. Additionally, Plaintiffs assert that there will be no prejudice to Defendants because they were aware of the due process claim, and that it is unclear that there would be a legitimate need for further discovery.

All Defendants vigorously opposed this amendment, raising a number of concerns. First, that the few mentions of due process are solely in the context of contract rights asserted in the general factual allegations, and then repeated in the dismissed third cause of action for "Contract Against Akal." Second, that there is no good cause to potentially alter the scheduling order under Federal Rule of Civil Procedure 16(b). Third, that there would be prejudice because full discovery could not be had, and there may be a disruption of the expert witness deadline. Fourth, there has been undue delay in adding the cause of action, demonstrated by the fact that Plaintiffs provide no explanation for the delay, or for failing to include the claim in prior amendments.

When the Court granted Plaintiffs leave to file a second amended complaint, Plaintiffs admit that the Court explicitly instructed there would be no further amendments. *See* Request For Instructions RE: Filing Second Amended Complaint at 1-2 (September 18, 2003) (Docket No. 94). For that reason alone, the Court would be within its discretion to deny this amendment. However, in the interest of justice, and acknowledging the liberal nature of Rule 15, the Court

entertains the parties' arguments. Strangely, both the moving and opposing papers buttress the decision to deny amendment. Plaintiffs, in characterizing the amendment as technical do not deny that they could have amended to add this claim from the very inception of the suit. Why there is a need for "clarification" at this time is not explained. This admission puts Plaintiffs' amendment squarely within the scope of amendments that are disfavored under *Acri*.

However, at oral argument, many of the Court's concerns about allowing leave to amend for lack of timeliness and prejudice were largely extinguished. The Defendants indicated that there was no time urgency on their part in deciding the motion for leave to amend. Further, the parties expressed willingness to move the trial date, depending on the outcome of this motion. Thus, a major concern of the Court regarding time to explore this issue before trial and prejudice to Defendants was removed. However, at oral argument the Defendants noted the likelihood that the amendment to add a due process claim may be futile in light of the tentative holding that the Plaintiffs were government employees for the purposes of the Rehabilitation Act. This issue has critical bearing on the question of whether leave to amend should be granted. *See Bonin*, 59 F.3d at 845. Accordingly, the Court ordered supplemental briefing limited to the question of futility of amendment.

Plaintiffs seek to add a cause of action alleging due process violations. Plaintiffs claim boils down to the assertion that they were terminated based on an incorrect determination of medical qualification, and that there should be some process by which they can appeal or present evidence to rebut that determination.[7] Defendants argue that both procedural and substantive due process claims cannot be sustained against the government for adverse employment decisions based on discrimination.

As discussed in section B, *infra*, the Rehabilitation Act sets forth a comprehensive remedial scheme for discrimination against federal employees. The Supreme Court has held that

---

[7]Plaintiffs have further gone to great lengths by way of expert testimony to demonstrate that the medical standards used by the USMS are illogical and/or deficient. However, evaluation of the USMS methodology is not an issue before the Court, and this decision in favor of the USMS does not signify judicial imprimatur of such standards.

Title VII of the Civil Rights Act of 1964 "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835, 96 S. Ct. 1961, 1969 (1976). This holding was predicated on the fact that Title VII is pre-emptive and thus forecloses other avenues of relief. *Id.* at 829, 96 S. Ct. at 1966. Section 501 of the Rehabilitation Act imports the "remedies, procedures, and rights set forth" in Title VII. 29 U.S.C. § 794a. Thus, when a claim is properly brought under the Rehabilitation Act, a plaintiff is precluded from asserting other causes of action for that same claim. "This has lead [sic] every court that has considered the issue presented here to hold that the Rehabilitation Act provides the exclusive judicial remedy for claims based on a federal employee's disability." *Hupka v. Dep't of Defense*, 134 F. Supp. 2d 871, 875 (E.D. Mich. 2001).

The Ninth Circuit has ruled similarly in the context of racial discrimination, but the Court is not aware of a case involving disability and the Rehabilitation Act. *See, e.g.*, *Scott v. Perry*, 569 F.2d 1064, 1065 (9th Cir. 1978) (dismissing as pre-empted Fifth Amendment and section 1983 claims for racial discrimination against government employer). Plaintiffs do not dispute that *Hupka* represents the state of the law. Rather, they assert that the proposed due process claim and Rehabilitation Act claim are distinct. This argument is unconvincing. Their original claim is for discrimination based on the perception of disability. Now they seek to add a due process claim for the mechanism by which the alleged discrimination occurs. These claims are the same, notwithstanding Plaintiff's characterization of them as stand-alone.[8] Because due process claims under the Fifth Amendment are pre-empted by the Rehabilitation Act, amendment to add a due process claim would be futile. Accordingly, Plaintiffs' motion to amend is DENIED.

**B. Rehabilitation Act Claim**

*1. Legal Standard*

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

---

[8]Plaintiffs conflate the Court's determination of their inability to make triable case under the Rehabilitation Act with a determination that the neither the Rehabilitation Act nor the Fifth Amendment provide suitable legal theories for suit.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; to defeat the motion, the non-moving party must affirmatively set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Id.* at 256, 106 S. Ct. at 2514. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 2553-54 (1986).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

*2. Analysis*

The Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*, provides remedies for those discriminated against by the federal government due to disability. Sections 501 and 504 of the Rehabilitation Act offer avenues by which Plaintiffs may seek recovery against the Federal Defendants. Section 501 applies only to federal employees and "obligates federal employers to

provide accommodation for the handicapped and to develop and implement affirmative action plans for handicapped employees." *Johnston v. Horne*, 875 F.2d 1415, 1418 (9th Cir. 1989). On the other hand, Section 504 can apply in the absence of an employment relationship because it prohibits, among other things, discrimination in "any program or activity conducted by any Executive agency." 29 U.S.C. 794(a); *Redd v. Summers*, 232 F.3d 933, 937 (D.C. Cir. 2000).

Both sections provide that the discrimination standards to be used for federal employees are the same as those to be used under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 *et seq.*, as they relate to employment. 29 U.S.C. §§ 791(g), 794(d). However, in order for there to be liability under Section 501 disability need only be *a factor* in employment discrimination, whereas under Section 504, the discrimination in employment must be *solely* because of the disability. *See* 29 U.S.C. § 794(a) ("solely by reason of his or her disability"); *Pernice v. City of Chicago*, 237 F.3d 783, 786 n.3 (7th Cir. 2001) (noting existence of "a host of decisions holding that the ADA prohibits employment discrimination if a covered disability is one motivating factor, even if not necessarily the sole cause, of the adverse employment action").

Thus, under both Section 501 and 504 the Court must examine whether there was a violation of ADA standards. The threshold question of whether the government is the employer determines which section applies, and thus dictates degree of discrimination that must be shown to prove liability.

*a. Government Employment*

Here, the terms of the employment arrangement between Plaintiffs, Akal, and the government are clearly delineated in extensive documents, including the contracts between Akal and the United States Marshal's Service ("USMS"), and the Oath of Office for contract CSOs. There are no legitimate disputes as to the facts involved in the employment of CSOs; the only question is whether the facts establish that CSOs were government employees.

The legal standard in for determining whether a worker is a government employee is uncertain in the Ninth Circuit. The well-established "hybrid common law test" examines the "economic realities" of the employment relationship. *See Lutcher v. Musicians Union Local 47*,

633 F.2d 880, 883 (9th Cir. 1980) (citing *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979)). The factors to be examined include, among others: (1) the extent of the employer's right to control the means and manner of the work; (2) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (3) whether the employer or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) whether the work is an integral part of the business of the employer; (6) whether the work accumulates retirement benefits; (7) whether the employer pays social security taxes; and (8) the intention of the parties. *Id.* at 883.

In *Lopez v. Johnson*, 333 F.3d 959 (9th Cir. 2003), the Ninth Circuit cast doubt on the applicability of the hybrid common law test. "[T]he multi-factor common law hybrid test is ill-suited for determining whether an individual, who is indisputably an employee of an independent contracting entity that provides employees to perform services for the government is also an employee of the government." *Id.* at 963. The *Lopez* Court noted that a "joint employment test" may be more appropriate. *Id.* Such a test would examine "whether one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* (quoting *Redd*, 232 F.3d at 938) (internal quotations and alterations omitted). However, the *Lopez* Court declined to settle on a single test, finding that the plaintiff was not a government employee under either test. *Id* at 963-64.

In *Lopez* the plaintiff was an employee of ATA, an independent contractor for the Navy. *Id.* at 960. He performed computer services at the Navy's Puget Sound Naval Shipyard (PSNS). *Id.* Lopez had a prosthesis for his leg that made walking long distances difficult, and he made a request for a handicapped parking permit so that he could park closer to his place of work at PSNS, instead of several blocks from the perimeter of the shipyard. *Id.* at 961. PSNS denied the request, asserting that as an ATA employee, it was ATA's duty to accommodate his disability. *Id.* Lopez filed an equal employment opportunity that was twice dismissed by the PSNS on the grounds that he was not a federal employee, and subsequently affirmed by the Equal

Employment Opportunity Commission. *Id.* In finding that Lopez was not an employee of the government under the joint employment test, the Court stated:

> Although the Navy retained control over parking within PSNS and provided the office space and equipment Lopez used, it did not retain any control over the terms and conditions of his work. ATA was solely responsible for hiring and training Lopez. ATA maintained its own supervisors on site within PSNS who set his work schedule, and solely assigned and supervised his work. Lopez was required to report to ATA supervisors, not to PSNS personnel, if he were sick or late. PSNS thus did not retain for itself sufficient control of Lopez under the joint employer test to be deemed his employer together with ATA.

*Id.* at 963-64. The Court then came to the same conclusion under the common law hybrid test, because "[o]ther than providing the situs of the work Lopez performed, PSNS had no control over his job performance." *Id.* at 964.

The CSO services at courthouses in each federal circuit are controlled by individual contracts; Akal currently has contracts to provide such services in nine Circuits. Akal is a private security company that provides security services to a number of other government and private entities. A Contracting Officer's Technical Representative (COTR), who is a Deputy U.S. Marshal, is appointed to monitor performance of the CSO contract. Akal's management team under the contract consists of a Contract Manager for each Circuit, who is the primary USMS contact, and must be available twenty-four hours a day. Most judicial districts have a Site Supervisor who oversees day-to-day operations and quality control. Further, at each facility there is a Lead CSO (LCSO) who directly supervises the CSOs at that facility and provides the monitoring and reporting required by the contract. Normally, USMS personnel do not direct the activities of CSOs, but in the event of an emergency, the USMS reserves the right to do so.[9] Each CSO is deputized as a U.S. Marshal and takes an Oath of Office. This oath specifically includes an acknowledgment that the CSO is not an employee of the United States.

The contract between Akal and the USMS demonstrates that there is a close relationship among Akal, the USMS, and the CSOs. Some portions of the contract militate for a finding that

---

[9]According to the contract, "[e]mergencies include, but are not limited to a directive from a federal judge, bomb threats, fires, or imminent personal danger to a judge, juror, witness, attorney, or other court personnel." Ninth Circuit Contract C-18.

the USMS is the employer, while others indicate that Akal is the employer. Akal is responsible for managing the work hours and assignments of CSOs to satisfy contract hour requirements. Akal is entirely responsible for the hiring and firing of CSOs, payment of their salaries and fringe benefits, scheduling of vacation, discipline, and performance of services in accord with the contract. There are various reporting and logging requirements that Akal must also comply with. Plaintiffs cite a number of contract clauses as part of their argument that they should be considered government employees. Those examples include the USMS: (1) paying for uniforms, weapon qualifications, and medical examinations; (2) dictating a minimum pay schedule for employees; (3) providing training for CSOs; (4) providing medical and physical requirements; (5) deputizing CSOs; (6) furnishing radio, weapons, handcuffs, and identification; (7) deciding whether overtime is required; (8) planning routes and schedules for CSO patrols; (9) determining operating procedures for CSO stations; and (10) dictating possible changes in duties on a daily basis.

There is no question that the contract contains a vast web of requirements dictating how Akal must perform its responsibilities. Like any contract for services between large and sophisticated entities, there is a great deal of specificity regarding those requirements and duties. For the most part, the clauses in the contract describing the duties and tasks of CSOs referred to by Plaintiffs are unexceptional. The ability to alter the scope of the duties of CSOs, as long as exercised at the contract level through the management hierarchy of Akal, does not point towards an employment relationship. However, the USMS *does* reserve the right to direct CSOs in the event of emergencies, and such direct control does suggest an employment relationship.

Although not discussed in detail by the *Lopez* Court, it is reasonable to assume that the contract with the Navy under which ATA employed Lopez contained similarly detailed provisions delineating the services to be provided by ATA. The presence of such provisions in the USMS contract with Akal does not necessitate a finding of an employment relationship with CSOs. Similar to *Lopez*, here Akal is the entity involved in the day-to-day management of the CSOs, who work at federal buildings. Their payment, holidays, benefits, and reprimands are all the responsibilities of Akal, not of the USMS. Further, there is a clear showing from the

evidence that there was no intent for the CSOs and the USMS to enter into an employment relationship.

Like the Navy in *Lopez*, the USMS does not have the power to directly fire CSOs, but it may make a medical finding that results in disqualification of an individual to work as a CSO. No such ability was retained by the Navy in *Lopez*. Although that disqualification does not absolutely mandate the firing of the individual by Akal, the practical effect of such an adverse finding is likely to be the firing of the CSO. This is especially true given that the CSOs may persist at a given building while government contractor changes. The fact that the CSOs and the USMS remain at a site, while the "employer" of the CSOs changes suggests a fiction in terms of the true employer. Even if a disqualified CSO would be able to take another job within Akal, the fact that at any time, regardless of the contractor, the USMS could effectively end a CSO's career with an unfavorable medical review suggests an employment relationship. There is undeniably a vital interest in ensuring the competence of CSOs, but if the USMS wishes to examine and disqualify individual CSOs, it must be prepared to be treated as an employer.[10] The government cannot be allowed to structure its contracting relations so that in employment decisions it can have its cake and eat it too. Under both tests discussed in *Lopez*, the CSOs employed by Akal also had an employment relationship with both Akal and the USMS and thus may state a claim under Section 501 of the Rehabilitation Act.

*b. Exhaustion of Administrative Remedies*

"[A] federal employee who alleges employment discrimination on the basis of a handicap must exhaust the administrative remedies available under Title VII; Title VII provides the exclusive channel by which such allegations may be heard in federal court." *Vinieratos v. United States*, 939 F.2d 762, 773 (9th Cir. 1991) (citing *Boyd v. United States Postal Service*,

---

[10]At oral argument, the Defendants analogized the medical disqualification to a security clearance or a requirement of three years experience. The latter situation is clearly not similar, since a requirement of experience is a one-time qualification for a job. The question of security clearances at first impression appears not to be analogous to this case, and since each employment relationship analysis is fact specific, it is improper and fruitless for the court to speculate on that hypothetical case.

752 F.2d 410, 413-14 (9th Cir. 1985)). The administrative procedures required in order for the Court to have jurisdiction include, as a preliminary matter contacting an EEO counselor at the USMS within forty-five days of the allegedly unlawful employment action. *See* 29 C.F.R. § 1614.105; *see also* 42 U.S.C. § 2000e-16(c) (setting forth conditions under which an employee may sue the federal government for discrimination). "[Section] 2000e-16(c) is a condition to the waiver of sovereign immunity and thus must be strictly construed." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94, 111 S. Ct. 453, 456 (1990). However, the Supreme Court goes on in *Irwin* to indicate that principles of equitable tolling may apply to the *time limits* for invoking the administrative process, "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Id.* at 96, 111 S. Ct. at 458 (footnote omitted).

It is undisputed that thirteen of the remaining Plaintiffs have not even initiated the administrative process.[11] Further, Plaintiffs Robert Kelly and Ernest Tautimes filed their complaints at the end of March, 2004, and well after beginning participation in this suit. But, Plaintiffs' failure to invoke the administrative process is not absolutely fatal to their claims, because under 29 C.F.R. 1614.105(a)(2), the USMS has the discretion to extend the time to file "for other reasons considered sufficient." Thus, it is possible that the USMS may allow the administrative process to go forward for those fifteen plaintiffs notwithstanding the delay of more than forty-five days. While it seems doubtful that the USMS would make such a decision, the discretion belongs to that agency and not to the Court. Absent a theory excusing these fifteen plaintiffs from the jurisdiction administrative exhaustion requirement, their cases must be dismissed without prejudice as premature.

---

[11]Those plaintiffs are George Barr, Albert Busam, Kenneth Bush, Harlan Coy, Jerry Cranford, L.J. Foster, Earl "Scott" Lloyd, Ben Richardson, James Sparkman, Mark Smith, Herman Strauss, Ron Vencill, and Jerry Young. At oral argument, Plaintiffs indicated that these plaintiffs have now initiated the process, but a response from the EEO is pending.

Plaintiffs have put forth several arguments to support subject matter jurisdiction in the absence of administrative filings. First they argue that Defendants should be estopped from asserting the jurisdictional bar because they misled plaintiffs to believe that there was no means of appeal. Plaintiffs misapprehend *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S. Ct. 1127 (1982), to reach this legal conclusion. *Zipes* makes the holding, later approved of by *Irwin*, that the *timely filing requirements* for administrative procedures are subject to waiver, estoppel, and equitable tolling. *Id.* at 393, 102 S. Ct. at 1132. Plaintiff does not otherwise support the remarkable conclusion that sovereign immunity could be waived by estoppel, and this argument fails. Plaintiffs futility arguments fail for the same reason—the administrative procedure must be followed in order to take advantage of Congress' limited waiver of sovereign immunity. *See Irwin*, 498 U.S. at 95-96, 111 S. Ct. at 456-58.

Plaintiffs second argument is that the timing requirements for filing should be tolled. As noted above, those requirements are subject to tolling. But, the Ninth Circuit has held that in a Rehabilitation Act claim, "once a claimant retains counsel, tolling ceases because she has gained the means of knowledge of her rights and can be charged with constructive knowledge of the law's requirements." *Leorna v. Dep't of State*, 105 F.3d 548, 551 (9th Cir. 1997) (internal quotation marks omitted) (collecting cases). The fact that this case was filed as a class action that failed to be certified does not provide shelter from timing requirements, and "piggybacking" of claims from plaintiffs who have not complied with the administrative process onto those of other plaintiffs who have complied cannot be allowed. *See Inda v. United Air Lines, Inc*, 565 F.2d 554, 558-59 (9th Cir. 1997) (holding that each plaintiff must individually be qualified to sue via the required administrative process). Plaintiffs have also argued that they should be excused from the requirement of filing an administrative complaint because it would futile. Futility, whether real or merely perceived cannot be sufficient to leap the jurisdictional hurdle of an administrative review that Congress chose to couple with its waiver of sovereign immunity.[12]

---

[12] Regarding Plaintiffs' estoppel, tolling, and futility argument, the Court further notes that "equitable remedies are unavailable in federal court when the record shows that

Finally, in response to Plaintiffs arguments and failure to take action to perfect their right to sue, the Court refers back to the February 18, 2004 Order Denying Motion for Class Certification (Docket No. 125):

> At oral argument, in response to the numerosity requirement, Plaintiffs' counsel raised the issue that many of the allegedly harmed CSOs would not be able to pursue their claims without the class action device because they had not filed timely administrative claims. While not directly relevant to numerosity, this does raise a general fairness argument that the Court will address. The Court is of the opinion that it is up to individual potential class members to protect their own interests by filing necessarily administrative claims. They cannot merely rely on the possibility that a class will be certified and sit on their rights as individuals. Furthermore, there are exceptions built into the law that allow for reasonable reliance on the class action mechanism – most relevant to this case is a tolling of the statutory period for filing administrative claims while a class action motion is pending. While it is reasonable for an individual to delay his or her individual claim while a motion for class certification is pending, it is not reasonable for an individual to put his or her claims on hold in the hope that *someday* a class will be certified, especially when the class certification has already been denied by the court.

*Id.* at 3. For the reasons stated above, the claims of George Barr, Albert Busam, Kenneth Bush, Harlan Coy, Jerry Cranford, L.J. Foster, Robert Kelly, Earl "Scott" Lloyd, Ben Richardson, James Sparkman, Mark Smith, Herman Strauss, Ernest Tautimes, Ron Vencill, and Jerry Young are DISMISSED WITHOUT PREJUDICE.

c. *Section 501 Claims*

The claims of the ten remaining Plaintiffs must now be evaluated with regards to their claims under Section 501 of the Rehabilitation. Section 501 provides that the standards to be used under that section for federal employees are the same as those to be used under the ADA, as they relate to employment. 29 U.S.C. § 791(g). To state a prima facie case of disability discrimination in employment, a plaintiff must show that he (1) is an individual with a disability, (2) was otherwise qualified, and (3) an adverse employment action was taken because of his disability. *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990).

To be an individual with a disability, a person must have: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

---

no administrative filing was ever made." *Sommatino v. United States*, 255 F.3d 704, 710 (9th Cir. 2001).

(B) a record of such an impairment; or (C) be[] regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiffs base their claims of discrimination solely on the "regarded as" definition of disability. To meet this standard, the USMS must have either "mistakenly believe[d] that [Plaintiffs] ha[ve] a physical impairment that *substantially limits* one or more major life activities, or . . . mistakenly believe[d] that an actual nonlimiting impairment *substantially limits* one or more major life activities." *Sutton v. United Airlines, Inc.*, 527 U.S. 479, 489, 119 S. Ct. 2139, 2149-50 (1999) (emphasis added). This standard set forth by the Supreme Court is a subjective one that requires the USMS to have misconceptions about the abilities of the Plaintiffs. *Id.* Analysis under the "regarded as" definition of disability first requires identification of the life activities involved. "A major life activity is a function 'such as caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, speaking, learning, and working.'" *Coons v. Secretary of U.S. Dep't of Treasury*, 383 F.3d 879, 885 (9th Cir. 2004) (quoting 29 C.F.R. § 1630.2(I)). All ten Plaintiffs claim that the USMS regarded them as substantially limited in the life activity of working, eight also add a claim regarding hearing,[13] and the other add two have claims regarding caring for themselves (stemming from diabetes).[14] The Court examines the claims for each asserted major life activity separately.

*1. Major Life Activity: Working*

Federal Defendants do not concede that "working" is a life activity, echoing concerns raised by the Supreme Court in *Sutton* and by the Ninth Circuit in *Johnson v. Paradise Valley Unified School District*, 251 F.3d 1222, 1226 n.3 (9th Cir. 2001). "To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 492, 119 S. Ct. at 2151. Plaintiffs were medically disqualified from working as CSOs based on failure to meet medical requirements. Plaintiffs do not present any direct or circumstantial evidence demonstrating

---

[13]The hearing claims are made by John Bianchi, Pete Chiabaudo, William Gray, Walter Lamb, James Sheridan, Ron Strolberg, Floyd Voeltz, and Isaiah Williams.

[14]Those plaintiffs are Alberto Garcia and Charles Hawkins.

USMS perceptions of disqualified CSOs as substantially limited. Instead, Plaintiffs seek to reverse-engineer the perceptions of the USMS by having their own expert, vocational specialist John Janzen, analyze the CSO job medical requirements and give opinions on the other jobs for which such requirements might disqualify an individual. Plaintiffs thus argue that since Janzen believes the CSO medical standards would lead to disqualification from a broad array of jobs, that the USMS believed Plaintiffs to be disabled from working in those jobs as well. Janzen's testimony is deficient for two reasons. First he imputes the requirements of the CSO job to other jobs without proffering evidence that the requirements are indeed the same. This specific sort of argument was rejected by the Supreme Court in *Sutton*, 527 U.S. at 493-94, 199 S. Ct. at 2151-52. Second, Janzen failed to present evidence regarding the labor markets and/or jobs from which the Plaintiffs were disqualified. "Under the law of our circuit, a plaintiff must present specific evidence about relevant labor markets to defeat summary judgment on a claim of substantial limitation of 'working.'" *Thornton v. McClatchy Newspapers*, 261 F.3d 789, 795 (9th Cir. 2001). The expert testimony proffered by Plaintiffs does nothing to create a triable issue as to whether Plaintiffs were perceived as disabled in the major life activity of working, and Defendants are entitled to summary judgment in their favor on this issue.

2. *Major Life Activity: Hearing*

In the context of eyesight, the Ninth Circuit has provided guidance on what "a claimant must show in order to have a substantially limiting impairment of a major life activity, and in turn, to be 'regarded as' having such an impairment, for purposes of the ADA." *EEOC v UPS*, 306 F.3d 794, 796-97 (9th Cir. 2002). The Circuit held that "for a monocular individual to show that his impairment is a substantial limitation on the major life activity of seeing, the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life." *Id.* at 797 (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681 (2002); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S. Ct. 2162 (1999); and *Sutton*, 527 U.S. 471, 119 S. Ct. 2139 (1999)). Although *UPS* did not involve hearing, the reasoning with regards to eyesight is analogous. It is undisputed that the USMS did believe that the hearing of the CSOs fell below the thresholds set as standards for the

job. However, this fact is not sufficient on its own to raise a triable issue of fact regarding whether the USMS believed the CSOs to be restricted in their hearing "compared with how unimpaired individuals normally use their [hearing]." Critically, Plaintiffs have failed to show a scintilla of evidence tending to prove that the USMS harbored such beliefs. Indeed, with regards to the hearing standards, Plaintiffs have alleged that the standards required for CSOs are higher than those for a number of other federal security officer positions. This fact suggests that the USMS had simply set a high standard, and thus the perception of failure to meet that standard is far from the perception of impairment in hearing in general. Plaintiffs does nothing to create a triable issue as to whether Plaintiffs were perceived as disabled in the major life activity of hearing, and Defendants are entitled to summary judgment in their favor on this issue.

*3. Major Life Activity: Caring for Self*

Plaintiffs assert that the USMS perceived them as disabled in the major life activity of caring for themselves. This activity "encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning home." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) (citing *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995)). Plaintiffs assert that their dismissal due to diabetes tests establish that they were perceived as unable to care for themselves. However, the Ninth Circuit, in the context of a diabetes case has indicated that "being unable to care for oneself four times during a five month period [due to insulin reactions] is not a substantial limitation." *Fraser v. Goodale*, 342 F.3d 1032, 1043 (9th Cir. 2003). Like *Fraser*, the record in this case indicates that the concern of the USMS was about sporadic and potentially dangerous incidents of hypo- or hyper-glycemia, not a general inability to care for oneself. Although Plaintiffs dispute the medical conclusions and methods that led to their dismissal, they do not raise questions of fact regarding a perception of disability. Defendants are entitled to summary judgment in their favor on this issue.

## III. CONCLUSION

For the reasons set forth above, the Court makes the following determinations:

(1) Plaintiffs' Motion to Amend (Docket No. 140) is DENIED AS FUTILE.

(2) Plaintiffs' Age Discrimination in Employment Act claim is DISMISSED WITH

PREJUDICE.

(3) Plaintiff Harry Mason's Motion to Dismiss his claims with prejudice is GRANTED.

(4) The Rehabilitation Act Claims of George Barr, Albert Busam, Kenneth Bush, Harlan Coy, Jerry Cranford, L.J. Foster, Robert Kelly, Earl "Scott" Lloyd, Ben Richardson, James Sparkman, Mark Smith, Herman Strauss, Ernest Tautimes, Ron Vencill, and Jerry Young are DISMISSED WITHOUT PREJUDICE.

(5) Summary Judgment is GRANTED in favor of the Federal Defendants with regards to the Rehabilitation Act Claims of Plaintiffs John Bianchi, Pete Chiabaudo, Alberto Garcia, William Gray, Charles Hawkins, Walter Lamb, James Sheridan, Ron Strolberg, Floyd Voeltz, and Isaiah Williams.

IT IS SO ORDERED.

DATED: JANUARY 19, 2005

David O. Carter

DAVID O. CARTER
United States District Judge